DOERFLINGER REALTY COMPANY, a corp., H. P. Bockrath and Blanche G. Bockrath (Plaintiffs), Appellants,

v.

Raymond U. MASERANG and Frances Patricia Maserang (Defendants), Respondents.

No. 29986.

St. Louis Court of Appeals. Missouri.

March 4, 1958.

Henry Ebenhoh and Walter S. Berkman, St. Louis, for appellants.

Hale W. Brown, Kirkwood, for respondents.

SAMUEL A. DEW, Special Commissioner.

Appellants, as plaintiffs in the trial court, sought by this action to recover from respondents $1,475 as a forfeiture under the terms of a contract to purchase certain residence property belonging to appellants Bockrath in St. Louis County, Missouri. The verdict and judgment were in favor of the respondents. Appellants' motion for judgment in accordance with their motion therefor at the close of the testimony or, in the alternative, for a new trial, having been overruled, they have appealed from the judgment.

The petition pleads and is based upon a written contract dated September 14, 1956, finally approved September 17, 1956, a copy of which is attached to the petition, whereby appellants Bockrath agreed to sell and the respondents, under the terms set forth, agreed to purchase certain residence property belonging to the Bockraths in Grantwood Village, St. Louis County, Missouri. It is alleged that appellant Doerflinger Realty Company was named in the contract as agent for the Bockraths; that on September 14, 1956, respondents executed and delivered the check of Raymond U. Maserang to said agent for $1,475; that thereafter respondents stopped payment on their check for the above deposit, whereupon the appellants demanded that cash be paid in lieu of the check, and that the purchase contract be consummated; that respondents failed and refused to pay the $1,475 and to consummate the contract. Appellants pleaded that they had complied with the terms and conditions of the contract, but that respondents have repudiated their obligations thereunder without just cause or reason. It is averred that under the contract, in event respondents fail to perform thereunder, they shall forfeit the deposit money, but that, nevertheless, they shall remain bound to fulfill the contract if so determined by the sellers, and out of the earnest money so forfeited, the agent's expenses shall first be reimbursed and the remainder be equally divided between the sellers and their agent. The prayer is for judgment for $1,475 at 6 per cent per annum and costs. The answer of respondents was a general denial.

For convenience and clarity the plaintiffs-appellants Blanche G. Bockrath and H. P. Bockrath, owners and sellers of the property in question, will be referred to at times as the "Bockraths," or the "sellers." Appellant Doerflinger Realty Company, their agents to whom also respondents applied for a loan described in the contract, will at times be referred to as "Doerflinger," and the defendants-respondents as "respondents" or the "buyers."

The original contract pleaded in the petition was introduced in evidence without objection. It was dated September 14, 1956. It was in the form of an acknowledgment by the sellers of a deposit by the buyers of $1,475 as earnest money and as a part of the consideration for the purchase of the property described, which the sellers thereby agreed to sell to the buyers for a total of $29,500, increased over the signatures of both parties to $31,250, the balance of which was to be paid in cash on or before the closing date, November 16, 1956. The contract contained the following typewritten provision: *"The undersigned purchasers make this offer subject to their ability to procure a cash loan first deed of trust against the above described property as per application for same now on file with Doerflinger Realty Company."* (Italics supplied.) Among other provisions the contract required the sale to be closed at the office of Doerflinger on or before November 16, 1956, and subject to the conditions shown on the reverse side of the contract. The instrument is signed by the buyers, by Doerflinger, as agent, and the Bockraths signed a provision therein to pay the agent a commission, as prescribed.

On the reverse side of the contract, among other things, as alleged in the petition, is a provision that the earnest money deposit shall be retained by the agent; that if the sale is closed, the deposit is to apply on the agent's commission; that if the sale is not closed due to the failure of the purchasers to perform, the deposit shall be forfeited by the purchasers, who, neverthe-less, shall remain bound to fulfill the contract if so determined by the sellers, but such shall not entitle the purchasers to enforce sale; that the deposit, if so forfeited, shall be first applied to the expenses incurred by the agent, the remainder to go one-half to the sellers and one-half to the agent. Also, on the reverse side, both parties personally signed the contract, as amended, to increase the sale price.

According to the appellants' evidence the respondents, on September 18, 1956, signed a separate written application prepared by and addressed to the Doerflinger Realty Company, authorizing that company, for a commission of 1½ per cent of the loan to procure for the respondents a first mortgage loan on the Bockrath property by November 16, 1956, of $20,000 for twenty years, to draw interest at 5 per cent per annum, payable $132 principal and interest in 1 to 240 months consecutively after date of closing, together with monthly installments on taxes and insurance premiums. The application was introduced in evidence without objection. It was explained that the original date of the loan application had been changed from September 14, 1956, to September 18, 1956, because of certain agreed deletions in the sale contract.

Appellants' further evidence was that pursuant to the sale contract, respondents, on September 14, 1956, delivered to Doerflinger their check for $1,475 "earnest" money as agreed; that on a later date appellants' agent Clawson talked with respondents. He testified that respondents said they would not be interested in going on with the sale contract because it would cost too much to finance it; that the interest was too high; that they "wouldn't go along with the five and a half or six per cent, that it would have to be less than that for financing." Witness said he had heard Mr. Bell, of the Doerflinger Company, tell respondents over the telephone that the loan would cost them 5½ to 6 per cent.

Appellants' witness Bell, sales manager for Doerflinger, testified that after deposit-

ing respondents' check for $1,475, his company received a letter from the bank on October 4, 1956, that respondents had stopped payment on the check. The check (marked "payment stopped") and notice were introduced without objection. The witness then talked to Mrs. Maserang, who gave no reason why she and her husband did not wish to go on with the purchase, but referred to her husband's health. Witness talked with Mr. Maserang before and after the payment on the check had been stopped and told him that Doerflinger had a commitment for a loan for 5½ or 6 per cent; that this was after Mr. Clawson had told respondents the same thing; that witness told Mr. Maserang that if he did not want such a loan "we would attempt to procure his five percent loan." When asked if he did not definitely tell respondents that his company could not get five per cent loans any more, that they were no longer available, in the St. Louis area, witness said: "I can't feel that I made a statement as positive as that, sir." He testified that his company did later obtain a 5 per cent loan for respondents from the Jefferson Savings & Loan Association before the closing date of the sale contract.

Lloyd D. Doerflinger, president of the appellant corporation, testified that within five days after the date of the sale contract, a commitment for a loan was obtained and made available to respondents up to the closing date of the contract; that it was obtained "quite a while" before the closing date of the contract, "I would say I received this (loan commitment) possibly five days after it was signed", "somewhere near" September 23; that he got the commitment orally from the committee of the Jefferson Savings & Loan Association. He could not recall to whom he reported this commitment for the loan at his office, but he personally did not report it to respondents. He said he was sure he reported it to someone of his company. He denied he had ever told Mr. Bell that he could not get anything but a 5½ or 6 per cent loan. He said he was also a member of the Board of the Jefferson Savings & Loan Association and one of three of its credit committee.

Appellant H. P. Bockrath testified that he had since sold his residence property to other parties at a higher price than respondents had agreed to pay. He testified that a warranty deed, introduced in evidence, had been signed by himself and wife and had been ready for the closing of the contract with respondents. He also identified a listing card signed by him and his wife covering the agency agreement on the property with Doerflinger providing for a 5 per cent commission in event of sale. He said he had bought another place to move into and he and his wife had been greatly inconvenienced in packing and worrying over the move required for the sale to respondents. He admitted that he understood the deal would not go through if respondents could not get their loan. He stated that Mr. Maserang's mother-in-law came with them to look at the house, and on that occasion Mr. Maserang said he was not going on with the deal and would not explain why. He said Mr. Maserang did not mention interest rate at that time, but said the real estate company was "too damn slow."

In behalf of the respondents, Mr. Maserang testified that a few days after signing the contract and loan application Mr. Clawson, a representative of Doerflinger, several times told him that he did not believe Doerflinger could get a 5 per cent loan, that it would have to be a 5½ or 6 per cent loan. Witness said he told Clawson he could not handle the transaction that way, and that he then contacted his attorney and later stopped payment on his deposit check on September 28, 1956, 14 days after the date of the contract. Meanwhile, he said, he had not been presented with any notes or other papers to sign in connection with any loan application.

Further testifying, Mr. Maserang stated that he and his wife received a letter dated October 24, 1956, four days less than a

month after he had stopped payment on his check, from an attorney for Doerflinger, which he identified and which was introduced in evidence. The letter informed respondents that a cash loan had been procured for them to be secured by a first deed of trust on the Bockrath property in accordance with respondents' application on file with the Doerflinger company, and was then available, and that a general warranty deed from the Bockraths had been signed and was ready for delivery. The letter requested respondents to call and close the contract with the Bockraths on or before November 16, 1956, and meanwhile to replace the check on which payment had been stopped with cash or certified check. The witness repeated that Mr. Clawson, a representative of Doerflinger, had told him that the loan would have to be at 5½ or 6 per cent interest; that there was no more 5 per cent money. He said he told Mr. Clawson that he could not afford it. When asked to give the exact language used, he said: "Well, they didn't think there was any five per cent money left, that it would have to be five and one-half or six per cent"; that witness was not asked to sign any further papers after that announcement until the letter of October 24, demanding a closing of the deal. He said that Mr. Bell had already told him that there was no more 5 per cent money; that he would see what he could do; that most of it was 5½ or 6 per cent.

On cross-examination Mr. Maserang, asked to repeat what Mr. Clawson had said regarding the loan prior to the time payment was stopped on the check, said: "He says 'it isn't being done like that any more; there isn't any that kind of money' * * * 'money is tight, and you can't get a loan like that any more.' " He said at one time his mother-in-law did accompany him and his wife to see the property; that she did point out to him some things that had not been brought to his attention. He said: "The main thing was, I told your company that I couldn't stand anything but a five per cent loan." He said that Dr. Bock-

rath was ill and would not have been able to vacate before Christmas, a point which he said threw some light on the matter of closing the deal.

Appellants' first point of error is that they were entitled to a directed verdict as requested at the close of all the testimony because all of the facts essential to appellants' recovery were admitted by respondents, and no evidence constituting a legal defense was offered.

■ Appellants failed to include in their brief, either under the heading "Statement" or "Evidence," any of the testimony that prior to the date when respondents stopped payment on their deposit check, representatives of Doerflinger, agent for the Bockraths, and to whom respondents had made application for the specified loan, had told respondents that a 5 per cent loan was no longer obtainable, and that their loan would have to be at 5½ or 6 per cent interest instead of 5 per cent. That there was such evidence in the case is material to their motion for a directed verdict. On such motion all of the evidence must be considered in the light most favorable to the respondents. Appellants, ignoring such evidence, contend that respondents had no lawful right to withdraw their deposit on the contract, which was expressly made contingent upon their ability to obtain the loan described in their existing application therefor, and that despite respondents' action in stopping payment on their deposit check on September 28, 1956, respondents remained bound to accept a 5 per cent loan obtained for them any time before November 16, 1956, the closing date of the purchase contract, and, likewise, obliged to close that contract with the sellers.

Respondents maintain that since the sale contract was made expressly on the condition precedent that respondents would be able to obtain a 5 per cent loan "as per application for same now on file with Doerflinger Realty Company," and since that company had notified respondents that such a loan could not and would not be obtained,

respondents then were justified in treating the loan application as null and void and to consider its termination as an anticipatory breach of the sales contract, rendering the latter impossible of performance, or if not impossible, at least making it no longer binding on respondents.

It was said by this court in Goss v. Suburban Motors, Inc., Mo.App., 282 S.W.2d 864, at page 866: "The general rule is that when one contracts to perform he is bound to do so, even though accidents or forces over which he has no control intervene, *where no provision is made against such contingencies.*" (Italics supplied.) In effect the same rule was approved in Ellis Gray Milling Co. v. Sheppard, 359 Mo. 505, 222 S.W.2d 742, 748. In that case the court distinguished the case of Schoen v. American National Ins. Co., 352 Mo. 935, 180 S.W.2d 57, in which the subsequent insanity of insured was held not to excuse him from the duty to report his disability, and it was pointed out that in that case the policy did not make such reports a condition precedent to recovery.

It is also the general rule that the law does not favor forfeitures. Steinke v. Leicht, Mo.App., 235 S.W.2d 115, 123; Bogad v. Wachter, 365 Mo. 426, 283 S.W.2d 609; Swain v. Maxwell, 355 Mo. 448, 196 S.W.2d 780; 17 C.J.S.Contracts § 407, p. 894.

In the instant case the uncertainty of respondents' ability to obtain the loan in accordance with their application then on file with Doerflinger was fully considered and expressly provided for in the purchase contract. In other words, it was, in effect, a stipulated condition precedent in their agreement that unless and until the buyers were able to get the loan on the terms of the application then on file with Doerflinger, there would be no further liability under the sale contract on the buyers' part whatsoever. Nothing could be plainer than the words mutually adopted in writing: "Undersigned purchasers make this offer subject to their ability to procure a cash loan first deed of trust against the above described property as per application for same now on file with Doerflinger Realty Company." Clearly the effect of such a provision is that if and when the loan application referred to was declined and rejected, of which there was substantial evidence, respondents' liability under the sale contract ceased, in the absence of any modification of the application or sale contract. Globe American Corp. v. Miller Hatcheries, Mo.App., 110 S.W.2d 393.

Upon the execution of the conditional sales contract here sued upon, only the Doerflinger Realty Company, to whom respondents, in a separate instrument of writing, had offered a commission of 1½ per cent to procure the loan described in the contract, could accept or reject the offer. Within a few days after the date of the contract and the loan application, according to substantial evidence in the record, the Doerflinger Realty Company informed respondents that it could not procure for them the loan applied for and could only obtain the loan at a higher rate of interest. If such evidence be true, respondents then had a right either to modify their offer and agree to accept the loan at a higher rate of interest, or to terminate the application. Nothing in the sale contract required them to seek a loan elsewhere or under different terms or under a different application. Having refused to accept the more expensive loan and having been denied the loan applied for, if the evidence to that effect be true, respondents, under the terms of the sale contract, were not further liable and rightfully stopped payment on their earnest deposit check held by the sellers' agent.

It was said by Grismore on Contracts, page 55, Section 35: "A rejection of the offer by the offeree has the effect of terminating it. The reason for this is plain. When the offeror receives a rejection he naturally assumes that the offeree is no longer interested in his proposal. Con-

sequently he would not consider it .to be necessary to revoke the offer were he to change his mind in regard to it." See, also Contracts, Restatement, Sections 35(a), 36 and 37.

■ The fact that over three weeks after respondents terminated their loan application upon its rejection by Doerflinger, if that be true, and after they had cancelled their deposit check on the sales contract, Doerflinger (also the agent for the sellers in the contract) notified respondents that a loan as per their application was then available, and demanded a closing of the loan and purchase, would not, in the absence of some showing of mutual consent, thereby cause the loan application then to be revived and the sales contract to be restored.

Grismore, at the same citation, supra, further states: "It would not be just to permit the offeree to complete a contract by an acceptance after he had put the offeror off his guard by leading him to think that his proposal was no longer being considered." In view of the evidence and the law applicable thereto the court did not err in refusing to direct a verdict for appellants.

The second point of error assigned is that the court erred in giving defendants' Instruction No. 2. That instruction required a verdict for defendants (respondents) unless the jury found that Doerflinger Realty Company had procured a loan for defendants all in accordance with their application prior to November 16, 1956 (the closing date fixed in the sale contract). Appellants argue that respondents repudiated their sale contract and thereby waived further efforts by appellants to procure their loan and, furthermore, that appellants, nevertheless, did procure such a loan on October 24, 1956, more than three weeks prior to the closing date of the contract. Respondents, on the other hand, contend that when the Doerflinger Company informed them that it could not fulfill their application for the specified loan,

the application became and remained inoperative and void, as did also the sale·contract made contingent upon it, and respondents accordingly and rightfully then withdrew their deposit.

■■ As we have held under Point I, respondents' offer or application to the Doerflinger Realty Company to pay it 1½ per cent commission if it could procure for them the loan specified, became no longer operative when that company notified respondents that it could not procure a 5 per cent loan, as specified, if the evidence to that effect be true, and when respondents thereupon terminated the offer and cancelled their deposit check under the contract. As we have also held under Point I, Doerflinger Realty Company could not, some three weeks after having rejected the offer, revive it by acceptance without the consent of respondents. An uncommunicated acceptance is not sufficient. Thacker· v. Massman Const. Co., Mo., 247 S.W.2d 623, 629; Bernblum v. Travelers Ins. Co. of Hartford, Conn., 344 Mo. 217, 125 S. W.2d 844. Acceptance of an offer must be unequivocal in order to create a contract. Restatement, Contracts, Section 58. Speaking of a necessity for a meeting of the minds to make a contract, it was said in McClintock v. Skelly Oil Co., 232 Mo.App. 1204, 114 S.W.2d 181, 189: "This meeting of the minds is not based on some secret purpose or intention on the part of one of the parties, stored away in his mind and not brought to the attention of the other party, but must be based on a purpose and intention which has been made known or which, from all of the circumstances, should be known."

■ It was, therefore, not error for the court to instruct the jury that in order to find the issues for the appellants, the jury must find that the Doerflinger Realty Company procured a loan for the respondents not only prior to November 16, 1956, but pursuant to the terms of respondents' application therefor in evidence.

Finding no error materially affecting the merits of the cause, the judgment should be affirmed. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion of Samuel A. DEW, Special Commissioner, is adopted as the opinion of the court.

Accordingly, the judgment is affirmed.

MATTHES, Acting P. J., ANDERSON, J., and JAMES D. CLEMENS, Special Judge, concur.